# HANS LORENZEN *v.* INTER-ISLAND STEAM NAVIGATION COMPANY, LIMITED, a corporation.

## DECIDED: JULY 15, 1902.

1. Where, in the process of transferring sugar from the hold of one ship into the hold of another ship, with the usual and customary appliances, a sling containing some 1,250 pounds of sugar was lowered unexpectedly by an employe of the defendant on to the deck of the ship into whose hold the sugar was being loaded, severely injuring the mate of said ship, who made ineffectual attempts to get out of the way of the descending sugar, and some evidence was introduced as to the giving of warnings of the coming of the sugar by the officers of the defendant; *Held*, that these warnings were not shown to have been brought home to the injured person. And further held, that "even if the warnings had been heard by him and disregarded, thus showing a degree of negligence on his part, that would not have relieved the defendant from the results of its negligence, if by the exercise of reasonable care it could have avoided the consequences of libellant's negligence."

2. While the theory that every man must look out for himself prevails, in so far that he shall not place himself deliberately in the way of injury, yet the law contemplates that every man, in his relation towards others, shall conduct himself with reasonable care and prudence, no matter what the imprudence of others may be; and if, by so conducting himself, he can avoid injury to the

person or property of another, he is liable for any injury resulting from a neglect to exercise such reasonable care and prudence.

3. Where an attempt was made to show that libellant contributed to his injury by walking in the direction of the sling load of sugar as it was swinging rapidly towards him, *Held*: While it is true that in moments of great personal peril a man may, under the excitement of the moment, fail to act with the cool, deliberate judgment that may characterize him in the ordinary occurrences of life, but under the stress of excitement may do exactly the reverse of that which is best for his safety, yet courts do not as a rule treat such conduct as contributory negligence.

4. Where it was shown that after the sling load of sugar was hoisted out of the hold of the ship and suspended from the donkey fall, that the strain was then transferred from the donkey fall to the burden line, and the duty of the burden man was to lower away slowly to the deck of the ship into whose hold the sugar was being loaded, and that in order to control the line, the burden man was obliged to take sufficient turns of this line round a post, the evidence that (as was shown by the libellee's own witnesses), at the time of the accident, he took but three turns, thereafter taking four, when no further difficulty was experienced in controlling the line, *Held*, to be a very significant fact in considering the cause of the injury.

5. The fact that the officers and crew of the defendant's ship had exclusive control of the appliances and gear being used in transferring the sugar from one ship to the other, is an important element in considering this class of cases.

IN ADMIRALTY. ACTION FOR DAMAGES FOR PERSONAL INJURIES.

*J. J. Dunne* and *R. W. Breckons*, proctors for libellant.
*Smith & Lewis*, proctors for libellee.

ESTEE, J.　This is an action for damages in the sum of $10,-240, for injuries received by libellant while on board the American barkentine "Irmgard" when said barkentine was anchored in the harbor of Honolulu about seven or eight hundred feet off shore, and while the "Noeau," a steam vessel owned and operated by the defendant, the Inter-Island Steam Navigation Company, Limited, a corporation, was anchored alongside of the said "Irmgard" and was discharging sugar into the "Irmgard" from the hold of the "Noeau" by means of machinery and appliances belonging to the said "Noeau."

The complainant was first officer of the "Irmgard;" that with

the exception of having given orders to the crew of the "Irmgard" to prepare the hatch with the chutes for the reception of the sugar, he had nothing whatever to do with the discharging or unloading of the said cargo of sugar into the hold of the "Irmgard."

It seems that between nine and ten o'clock in the morning of January 30th, 1902, the "Noeau" came out alongside of where the "Imgard" was lying with her head to the shore, and anchored alongside of the "Irmgard," the "Noeau" being headed off shore, so that they lay port to port. That after the "Noeau" came alongside of the "Irmgard" the crew of the "Noeau" commenced preparations to hoist the sugar out of the hold of the "Noeau" and to discharge the same into the hold of the "Irmgard."

It is admitted that the following is the process by which the sugar was transferred from the "Noeau" to the "Irmgard," to-wit:

Said "Noeau" had two masts, and from the foremast leading aft, was a wire rope. Attached to this span, and so placed as to be directly over said "Noeau's" hatch, was a block, and through this block a fall was rove, one end of which was fitted with a hook, while the other end led to the steam winch aboard the "Noeau." The purpose of said hook was to attach said fall to the sling loads of sugar for the purpose of lifting them from the hold of said "Noeau;" attached to the foremast of said "Noeau" was a gaff with a block made fast to its outer end, and through this block was rove a rope commonly known as the burden line. This burden line was made fast to the aforesaid donkey fall and permanently connected with it and designed to work with it. The object of said donkey fall was to hoist the sling load out of the steamer hold; and the object of the burden line, connected as aforesaid with said block at the end of said gaff was to swing the sling load from over the "Noeau" to over the "Irmgard," from which deck said sugar would pass into the hold of the "Irmgard" by chutes. As the sling load of sugar rises out of the hold of the "Noeau," the member of the crew of said "Noeau" in charge of said burden

line takes in the slack thereof, so that when the "Noeau's" winch eases up on the donkey fall the weight of the sling load is received by the said burden line and as said burden line lowers the sling load to the deck of the "Irmgard," the member of the crew of the "Noeau" in charge of the winch, then slowly slacks away on said donkey fall, and thus said donkey fall does the work of transferring said sugar, until each sling load is transferred to the said burden line, and thereafter the work is completed by the burden line.

It further was brought out on the hearing that the duty of the man at the burden line was to wrap the said burden line around a post or dolly head, so-called, so as to ease down the sling load of sugar on to the deck of the "Irmgard."

It is admitted that each sling load of sugar made up in this cargo, contained ten bags, each bag of the average weight of 125 pounds.

It is also admitted that the libellant was neither a member of the crew of the "Noeau" nor a fellow servant or workman of any member of said crew; and that he was not engaged in transferring the sugar from the "Noeau" to the "Irmgard;" that no machinery or appliances used were owned or operated by the "Imgard" nor was any member of her crew used in transfering this freight to the "Irmgard."

It further appears that when the first sling load of sugar was being transferred from the "Noeau" to the "Irmgard," and was over its deck, it struck the libellant, who was on the deck of the "Irmgard," knocked him down, rendered him senseless and broke his right leg below the knee; that libellant was therafter removed to the Queen's Hospital in Homolulu, where he remained, undergoing medical treatment until May 5, 1902.

The question involved in this case is one of negligence. Conceding the fact to be admitted that libellant received the injury for which he claims damages, was such injury the direct result of the defendant's negligence, or was there such contributory negligence on the part of the libellant as to defeat his recovery of damages?

It is a well known principle of law in cases of this charact that negligence of the plaintiff must have contributed directly produce the injury in order to defeat his recovery. In oth words, his negligence must have been such that but for it the injury could not have happened.

*Wharton on Negligence*, 302; *Railroad Company v. Jones,* 95 U. S. 439; *Mark v. Hudson, etc., B. Co.,* 56 How. Pr. 108; *Harvey, Administrator, etc., v. The New York Central and Hudson River R. R. Co.,* 19 Hun. (N. Y.) 556; *Kennard v. Burton,* 43 Am. Dec. 249; (25 Me. 39); *Haley v. Earl,* 30 N. Y. 208.

And the principle is equally well established, that the negligence of the defendant cannot be excused on the score of the negligence of the plaintiff. While the theory that every man must look out for himself prevails in so far that he shall not place himself deliberately in the way of injury, yet the law contemplates that every man in his relation towards others, shall conduct himself with reasonable care and prudence, no matter what the imprudence of others may be; and if by so conducting himself he can avoid injury to the person or property of others, he is liable for any injury resulting from a neglect to exercise such reasonable care and prudence.

*Inland & Seaboard Coasting Co. v. Tolson,* 139 U. S. 551; *Grand Trunk Railway Co. v. Ives,* 144 U. S. 408, 429; *Needham v. S. F. & S. P. R. Co.,* 37 Cal. 409, 419-20; *Essery v. S. P. Co.,* 103 Cal. 541, 544-5; *Lee v. Market St. Ry. Co.,* 135 Cal. 293, 295-6; *Baltimore & O. R. R. Co. v. Hellenthal,* 88 Fed. 116, 120-1.

"It is correctly stated that generally between persons standing in no particular relation to each other, as in this case, that alone is reasonable care, which in the judgment of men in general, is proportionate to the probability of injury to others; and, consequently, he who does what is more than ordinarily dangerous is bound to use more than ordinary care." (*Morgan v. Cox,* 22 Mo. 373; *Durant v. Palmer,* 29 N. J. L. 544, 546.)

"The measure of care against accident which one must take to avoid responsibility is that which a person of ordinary pru-

dence and caution would use if his own interests were to be affected and the whole risk were his own." (*The Nitro-Glycerine Case*, 15 Wall 524.)

It is claimed in this case, as in almost all cases of a similar character, that the libellant's injury was due to his own negligence and carelessness; and that in this instance the negligence consisted in not only not heeding the alleged warnings from the "Noeau," at or about the time the first sling load of sugar was coming over to the "Irmgard," but in apparently deliberately placing himself in danger of losing his life or limb by walking toward the sling load of sugar as it was swinging rapidly toward him.

It must be confessed this latter contention of counsel for defendant, does not appeal to the common sense of the Court or its experience of men in general. While it is true that in moments of great personal peril, a man may under the excitement of the moment fail to act with the cool, deliberate judgment that may characterize him in the ordinary occurrences of life, but may, under the stress of excitement, do exactly the reverse of that which is best for his safety, yet Courts do not as a rule treat such conduct as contributory negligence.

"A person of ordinary intelligence will not purposely expose himself to danger." *Cassidy, Admistrator, etc., v. Angell, Town Treasurer*, 12 R. I. 447. "The instinct of self-preservation is strong in human nature and stands for proof of care." *Allen v. Willard*, 57 Pa. St. 374; *Cleveland and Pittsburg R. R. Co. v. Rowan et ux.* 66 Id. 393; *Thomas, Adm'r, etc., v. The Delaware, Lackawanna & Western R. Co.*, 8 Fed. Rep. 729, 731.

But is such contention borne out by the testimony in this case? While it is true that Porter, the engineer of the "Noeau," testified strongly that Lorenzen stepped forward two and a half feet to meet the sling of sugar, and was struck in the front and knocked down by the sling load, yet he is the solitary witness in the case who so testified; and as I have before stated, such a statement of fact does not appeal to the reason of the Court aside from a consideration of the other flatly contradictory evidence

upon the same point. Lorenzen testified to the effect that he had been sitting on the rail of the "Irmgard" when he saw the sugar was about to be lifted out of the hold of the "Noeau," but before it had reached the top of the hatch, he got down and walked forward, away from the after hatch of the "Irmgard," where the sugar was supposed to land; that he heard nothing in the way of warning from the "Noeau" until a voice called out, "hold on, hold on," when he looked and the sling load was upon him, struck him on the shoulder, when he fell under its weight, and the load again struck him on the knee and broke his right leg.

Captain Schmidt of the "Irmgard" testified that at the time the accident happened "He (Lorenzen) was doing nothing; I did not observe him carefully; I was watching the sugar more than the mate." It appears from the deposition of Mr. Krause, the second mate of the "Irmgard," that he testified on this point as follows:

Q. "When the first sling load of sugar came over, what was he (the libellant) doing?

A. Walking.

Q. In what direction was he going?

A. He was going forward at the time.

Q. On which side of the ship?

A. On the port side. . . . . . . . .

Q. Did you notice where the sugar struck him?

A. Right back of the shoulder.

Q. What did it do to him?

A. Rolled him over, knocked him down and rolled him over.

. . . . . . . .

Q. What knocked him down, the sugar or the fenders?

A. The sugar.

Q. Did you notice whether he made any attempt to look out?

A. Yes, sir, he did.

Q. What was it?

A. He tried to run forward.

Q.   And it struck him before he got forward?

A.   Yes, sir."

Peahi, a stevedore, then working on the "Irmgard," testified that "when the sugar was in the act of being slung over, the mate began to move forward towards the bow of the 'Irmgard,' when the sugar struck him on the shoulder; that he fell down by the blow of the sugar and as he went down the sugar went right on his leg and broke his leg." Punaloa, also a stevedore, then on the "Irmgard," testified that while they were fixing the chutes on the "Irmgard," "the mate left the hatch and walked— that is, went towards the bow in a sort of diagonal way,. . . . . . . . when the sugar struck him, it struck him on the shoulder blade;" while Oomi, another stevedore, testified practically to the same effect, "that he was walking forward when he was struck by the sling load of sugar, and he was struck from behind."

In addition to the foregoing, the testimony of Gahan, the tally clerk of Schaefer & Co. on board the "Noeau," taking tally of the sugar at the time of the accident, is indirectly strongly corroborative of the fact that libellant was going forward when struck by the sling of sugar, and is in contradiction of the testimony of Porter, the engineer of the "Noeau." Gahan says that "when the sugar was coming over, he (Lorenzen) was ten feet, seven or eight feet, or nearly ten feet from the after hatch of the 'Irmgard;' " and when he was injured, "he was lying on the deck thirteen or fourteen feet from the forward part of the hatch." Kaamana, the man from the "Noeau" sent over to sew any broken bags, testified that when he first saw Lorenzen he was standing at the rail of the "Irmgard," somewhat forward of the hatch; but he afterwards saw him lifted up from a place about nine feet forward of the hatch, not the place where he saw him first.

There seems to be no reasonable explanation for this change of position testified to by both of these witnesses, other than upon the legitimate assumption that Lorenzen had moved forward and was moving forward when the sugar struck him. I think it is clearly in evidence that the libellant did all he could to avoid the injury. The evidence of the physician who at-

tended him directly after the injury is also corroborative of the blow being from behind. Dr. Sinclair testified that the bruise upon the shoulder "was excessively severe."

Upon this question of warnings having been given, the evidence is conflicting; no two witnesses testifying to a like state of facts. While I am inclined to think it possible that some sort of warning may have been given of the coming over of the sugar, yet it would be difficult to elucidate from the mass of contradictory testimony just what the warnings were or by whom given; some of the witnesses testifying that the warnings came from the "Irmgard" and others that they came from the "Noeau"; while many testify that there were no warnings, other than the words "hold on, hold on," from Captain Petersen to the burden man. Captain Petersen of the "Noeau" testified that he said "look out the sugar is coming" when the sugar was in the air, after it had been lifted out of the hold of the "Noeau;" Porter, the engineer of the "Noeau," says the captain (Petersen) called out "stand clear"; while the tally clerk, Harry Gahan, testified that Captain Petersen called out "to look out on deck." Schultz, the mate of the "Noeau", who did not see the accident, said that while in his room, he heard a lot of yelling, "get out of the way, stand clear."

But no one of the witnesses introduced by plaintiff testified to having heard anything but the "hold on, hold on" referred to by Lorenzen, just before the sling load struck him. Captain Schmidt of the "Irmgard," who had no reason to be other than a perfectly disinterested witness, testified as follows:

"Q. Before this first sling load of sugar was transferred from the 'Noeau' to the 'Irmgard', did you hear anybody, did you hear Captain Petersen or anybody call out or say anything relative to the sugar coming aboard? (A) Not that I remember before the first sling load came over. (Q) You did not hear anything? (A) Not before the first load. (Q) When was the first time you heard anything? (A) The first time I recollect hearing anything was when I heard 'hold on, hold on'; that was the first time I recollect."

And Mr. Krause, the second officer of the "Irmgard", also bears out the testimony of Lorenzen in this regard, as he swore as follows:

"Q. At the time of this occurrence or at the time of this matter of which we have just been talking about, or just previous to that time, did you hear any shouts or any calls from anybody aboard the 'Noeau' as relative to the fact that the sugar was coming aboard the 'Irmgard'? (A) I heard a call from our vessel 'to look out'........(Q.) Did you hear Captain Petersen call out? (A.) No, sir. (Q.) Didn't you hear anybody from the 'Noeau' call? (A.) No, sir."

Peahi testified that he heard nothing from the "Noeau" just before the sugar came over; while Punuloa upon being asked whether "when the sugar was being suspended from the donkey fall just above the hold of the "Noeau" or shortly after, he heard Captain Petersen say anything", he answered "no, he did not."

The court is forced to the conclusion that these alleged warnings, if given at all, were not brought home to the libellant, and it appears clear that they were not alone not brought home to him, but there is no testimony that any one on the "Irmgard" heard the warnings if any, rendering more probable the truth of the statement of Lorenzen that he did not hear them. But even if the warnings had been heard by Lorenzen and disregarded by him, thus showing a degree of negligence on his part, that would not have relieved the defendant from the results of its negligence, if any, if by the exercise of reasonable care it could have avoided the consequence of the libellant's negligence. (*Inland & Seaboard Coasting Co. v. Tolson*, 139 U. S. 551, 558).

It is evident from the testimony of the witnesses for the defendant, and especially from that of Captain Petersen, that the transferring of the first load of sugar is a very dangerous operation from the fact that it is difficult to tell just where the sugar will land, or how the machinery is going to operate. If this be so then the utmost care should have been used in the handling of the apparatus. But was this done?

It is shown that all of the rope used in the handling of this sugar was new rope; and there is some proof that the rope stretched, Captain Petersen testifying that the forward guy stretched some five feet. There is other testimony that it probably stretched some two or three feet, which I am inclined to believe is nearer the truth. It is a matter of common knowledge that new rope will stretch. Petersen claimed to be an experienced mariner, and he should have known this fact and guarded against it. But it is directly in proof that no test was made of the ropes, before the work of transferring the sugar began.

But, admitting that the rope stretched five feet, it would only have changed the position of the sugar where it struck the deck of the "Irmgard" five feet; and if it had not stretched, the sugar would have landed about eight feet forward of the hatch, as it is beyond dispute the sugar struck Lorenzen some thirteen feet forward of the hatch, when it should have landed near, or somewhere near the edge of the hatch.

When this sling load of sugar containing 1250 pounds weight was hoisted out of the hold of the "Noeau", and suspended from the donkey fall, it appears that the strain was then transferred from the donkey fall to the burden line, and the burden man's duty was to lower away slowly to the deck of the "Irmgard", after the donkey man has swung out the load free of the deck of the "Noeau"; and in order to control his burden line, the burden man is supposed to take sufficient turns of the line around a post or "dolly head" so-called. In this instance, when the sling load was suspended on the burden line, the man at the "dolly head" wrapped the rope around three times, but was unable to control its fall.

Kalauhi, the burden line man, testified:

"When the sling first commenced to come down, I was ordered to hold on to the slack and as the sling of sugar came down it had such a weight I couldn't very well hold it; there was some slack going through my hands; I suppose that was the time the man was hurt because the sugar was too heavy."

He further testified that the captain of the "Noeau" told him to "hold on"; that he held on "for a good while, a little while", but that the rope commenced to run again. "The weight of the sugar made it run."

He further testified, "that if he had more turns around the dolly head he could have stopped it; that would have fastened it altogether"; while Captain Petersen testified:

"He tried to hold on so that the sugar would remain in the air and not strike the deck, and he couldn't do it."

And Captain Petersen further testified:

"That at the first sling load the burden man took only three turns around the dolly head but he used four turns thereafter because he saw that he could not hold it with three."

This testimony was brought out upon the direct examination of this witness. It is clear that the kernel of this case is right here. Three turns were taken round the "dolly head" alone, and this man's injury was the result; after that four turns were taken and no more difficulty was experienced but the fall of the sling load of sugar was controlled. That the reason why the man at the burden line could not control or hold the sling of sugar was that he had not taken wraps enough around the "dolly head" seems to be clear. It was his duty to have seen this and remedied it, and it was the duty of the captain of the "Noeau" to have realized this and ordered the man at the burden line to take another wrap, and to see that it was done. Captain Petersen admitted that the burden line if held under control, while the sugar was being landed on the deck of the "Irmgard", would have doubtless placed it in its proper place, and inferentially avoided this accident. That is what the burden line is for, and that is what the burden man is for. And the fact that after the occurrence of the accident, it is in testimony that four wraps round the "dolly head" were taken, is a significant one.

It is true that the testimony of the officers and men of the "Noeau" was somewhat shadowy as to whether the sling load of sugar went down too fast or not. Captain Petersen evaded the direct question of the court on this point; but the weight of the evidence bears out the theory that the burden line man

lost all control over the fall of the sugar, and that it dropped by its own weight, possibly not so rapidly as was said by libellant "like a cannon ball", but certainly as fast as gravitation could carry it down.

That the injury to libellant was caused by the improper handling of the appliances and gear of the "Noeau" by the officers and crew thereof, who had exclusive control of the same in the transfer of this sugar is plain, after a consideration of all the evidence; and the fact of this exclusive control is an important element in this class of cases. *Miller v. Oceanic Steamship Co.,* of Savannah, 118 N. Y. 199, 208-9; *Cummings v. National Furnace Co.,* 60 Wisc. 603, 612; *The Robert Lewers,* Estee, J., decided Mar. 27, 1901; (1) *The Robert Lewers Company v. Kekauoha,* 114 Fed. Rep. 849. And especially is this so in view of the fact that the Court is unable to hold that there was contributory negligence on the part of the libellant.

Now as to the amount of damages. There is no question as to the injury to the libellant and he is entitled to some damages, not alone for the pain and suffering produced by the injury, but also for the possible length of time that he may be incapacitated from pursuing his calling of seaman.

It is in evidence that Lorenzen was acting as first officer of the "Irmgard", at a salary of sixty dollars per month when the accident occurred; that he was physically a sound, well man when he was injured; that he holds a certificate as first officer for sail and a certificate as second officer for steam. It seems reasonable to suppose that if this injury had not been inflicted, he would have been a sound man and able to pursue his calling uninterruptedly at a salary of at least sixty dollars per month for many years to come. Dr. Taylor, an expert called for the defendant, testified that in his judgment, while the injury was permanent, yet the body of libellant would adjust itself in time to the shortness of the injured leg, and that he thought "at the end of two years the leg will be as useful as it was before it was hurt." I am inclined to think that this is so, and being so that at the end of two years he will be able to resume his vocation of seaman, if not possibly before that time. I will therefore allow

libellant the sum of fourteen hundred and forty dollars, being the amount of wages at the rate of sixty dollars per month, which it is reasonable to assume he would have been able to earn in two years from the time of the injury, had he not been deprived of the ability to do so by this injury.

In addition thereto, libellant is entitled to something for the injury itself and the pain and suffering consequent thereon. The evidence shows, that the injury was a very grave one; in fact according to both the testimony of Dr. Humphris and Dr. Taylor, the injury is permanent, although the disability doubtless is not. That while the bones have knit, the joinder is not perfect, but is an overlapping one; that there is a curvature and the leg will continue to be from three quarters of an inch to an inch shorter than the other. In addition to the breaking of the leg, the libellant suffered grave bruises, the bruise on the shoulder being "excessively severe". He was confined to the Queen's Hospital for three months and some few days, suffering much pain; and it is in evidence that he still suffers pain and according to Dr. Humphris, there is a possibility that he will always suffer pain. It is difficult to measure pain in money. In most of the cases examined by the court, wherein injuries of a similar nature were sustained, the average damages assessed is about four thousand dollars, in full of everything. However, in the main, these cases show an injury if not greater at the outset, yet more severe in the permanent disabling effects than in the case at bar. I am therefore of opinion that in view of all the circumstances of this case, the sum of fifteen hundred dollars would be a fair compensation for the extra pain and suffering endured by libellant and will allow that amount in addition to the fourteen hundred and forty dollars already allowed, making a total of two thousand nine hundred and forty dollars, together with costs of suit."

Let judgment be entered in accordance herewith.

(1) See *ante, Kekauoha v. Schooner Robert Lewers Company*, page 75.